IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| EILEEN M. GARTHWAITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 5:14-CV-34 (MTT) |
| | ) |
| LYNN HAVEN HEALTH & | ) |
| HABILITATION and LYNN HAVEN | ) |
| NURSING HOME, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER

Pro se Plaintiff Eileen Garthwaite, a Caucasian female, contends she was subjected to a racially hostile work environment and constructively discharged in violation of Title VII. Before the Court is the Defendants' unopposed motion for summary judgment. (Doc. 13). For the reasons stated below, the motion is **GRANTED**.

### I.   BACKGROUND[1]

**A. Garthwaite's Job and Complaints of Harassment**

Eileen Garthwaite was hired in June 2011 as a cook at Lynn Haven Health & Rehabilitation ("Lynn Haven"). (Doc. 17 at 41:14-16, 51:13-14). Garthwaite worked as a prep cook and cook during the second of two shifts in Lynn Haven's kitchen with coworkers Teresa Ross and Apollonia McCrorey, both African-American. (Docs. 17 at

---

[1] Relevant to the present case, Local Rule 56 provides that "[a]ll material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise appropriate." After receiving notice of her option to respond to the motion for summary judgment with instructions on what the local and federal rules require, Garthwaite neglected to file any response to the Defendants' motion or their statement of material facts. Accordingly, the facts contained in the Defendants' statement are deemed admitted.

55:21-24, 84:20-23; 18, ¶ 3; 22, ¶ 2). The coworkers who worked during the first shift were also all African-American. (Docs. 17 at 55:19-20, 83:12-19; 20, ¶ 3; 23, ¶ 3). Barbara Jordan, an African-American, was Garthwaite's supervisor, and Joseph Nelson, a Caucasian male, was the administrator of Lynn Haven. (Docs. 19, ¶¶ 2-3; 24, ¶¶ 2, 4). According to Garthwaite, the discriminatory harassment by her coworkers and her supervisor began her first day of work and persisted until her resignation. (Doc. 17 at 58:11-19, 121:18-20).

Garthwaite testifies in her deposition that her coworkers discriminated against her by making comments about her cooking abilities and appearance.[2] (Docs. 17 at 59:1-7, 79:19-23; 21, ¶ 4; 22, ¶ 18). For example, Garthwaite testifies that a coworker said Garthwaite could not cook sweet potato pie, fried chicken, or collard greens because she was white. (Doc. 17 at 58:20-25, 79:4-12, 93:11-25). Garthwaite recalls being told by Teresa Ross that she could cook better than Garthwaite because Ross was black. (Doc. 17 at 151:5-18). Coworkers also criticized Garthwaite's appearance. For example, she was called "dirty"[3] and "nasty" because of the stains, food, and cat hair on her uniforms and because her coworkers thought she did not wash her hands, did not wear gloves, and left food out. (Docs. 17 at 61:23-62:1-4, 64:4-18, 69:2-3; 22, ¶ 20). According to Garthwaite, her coworker Apollonia McCrorey called her "dirty" at

---

[2] By failing to respond to the Defendants' statement of material facts, Garthwaite admits that the general criticisms about her cooking were about her cooking abilities and experience, not about her race. (Docs. 15, ¶ 8; 19, ¶ 8).

[3] By failing to respond to the Defendants' statement of material facts, Garthwaite admits the comment that she was "dirty" referred to her dirty uniform and her coworkers' perception that she did not wash her hands, did not wear gloves while cooking, left food out, and "was not a clean cook." (Docs. 15, ¶ 78; 17 at 61:13-25, 63:4-22, 64:11-18). She also admits that her uniform had dirty spots and cat hair on it. (Docs. 15, ¶ 84; 19, ¶ 12).

least three times a week but concedes that the comments referred to her uniform. (Docs. 17 at 60:6-61:25, 63:4-22, 64:11-18; 21, ¶ 3).

Garthwaite further testifies that her coworkers harassed her in ways beyond comments about her cooking and appearance.  Most of these complaints centered around coworker Apollonia McCrorey.  Specifically, Garthwaite testifies that in addition to calling her "dirty," McCrorey slapped her on the back of the head once, called her "Leanerbelle," told her to "watch her back," told her she was "the talk of the town," and admitted to her that "[a] lot of the aggravation [Garthwaite was] experiencing was because [she is] white."[4]  (Doc. 17 at 64:19-65:10, 66:4-8, 73:12-17, 73:21-74:6, 75:6-13, 76:17-18).  McCrorey did not recall slapping Garthwaite on the back of the head or telling her that she was being bothered because she is white.  (Doc. 18, ¶¶ 9-10). McCrorey did remember there was a lot of laughing and joking but never about race. (Doc. 18, ¶ 11).

Incidents of alleged harassment by other coworkers include their scorching her cheese sauce, hitting her with a sugar canister, and teasing her about breaking a water line.[5]  (Doc. 17 at 59:8-10, 93:17-94:3, 106:17-108:3).  Garthwaite felt that she

---

[4] Garthwaite also testifies that McCrorey "backstabbed" her to others while she was not at work by "probably" saying "little things" such as "that little white girl can't cook."  (Doc. 17 at 65:16-66:8, 67:2-9). The Defendants object to this testimony as hearsay.  (Doc. 14 at 13 n.10).  Even apart from hearsay problems, the alleged "backstabbing" statement was purely based on speculation.  Garthwaite herself admits that she can only speculate about what was said.  (Doc. 17 at 66:1-3, 68:3-5).  See Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1522 (11th Cir. 1995) ("Apart from hearsay problems, there was insufficient information as to when the statements were made, how knowledge of them was acquired, and when Edwards was informed of them (if she was).").  Garthwaite cannot provide when the statements were made and when she was informed of them.  Although she says Marshall told her about the statements, she admits that she cannot remember what he said McCrorey told him.  (Doc. 17 at 66:1-3). Accordingly, the Court does not consider this alleged statement in its ruling on the present motion.

[5] Garthwaite also testifies that her coworker Alice Greene blamed her for melting the seals on the blending machine.  However, by failing to respond to the Defendants' statement of material facts, she admits that Greene did not accuse her of melting the seals.

experienced these workplace problems because, as her coworker Tomas Marshall also purportedly stated, she is white.  (Doc. 17 at 51:21-52:2).

Garthwaite further testifies that her supervisor Barbara Jordan discriminated against her through various comments and actions.  For example, Jordan called Garthwaite "burr head rat" at least fifty times, which Garthwaite perceived as a racial slur but was not sure what it meant.  (Doc. 17 at 92:6-8, 151:19-152:2).  Jordan also called her "Mary" but stated that the nickname did not mean anything.  (Doc. 19, ¶ 6). Jordan also admitted that she would frequently call the employees nicknames, such as "buck head rabbit."  (Docs. 17 at 88:21-89:5; 19, ¶ 6).  Other employees confirmed that Jordan would often call all of them by nicknames, and one stated that she did not perceive the nicknames as racial slurs.  (Docs. 20, ¶ 10; 22, ¶ 21; 23, ¶ 17).  Garthwaite also testifies that Jordan discriminated against her by calling her multiple times at home to discuss work-related issues, blaming her for a burn ring on a cart when another employee did it, and throwing paper towels at her to "play[] around."  (Docs. 17 at 81:5-82:12, 88:15-20, 89:10-24, 90:13-16, 93:1-94:3).  Further, Garthwaite testifies that Jordan discriminated against her by choosing Teresa Ross and Tomas Marshall to cook for special events.  (Doc. 17 at 93:1-94:3).  By virtue of failing to respond to the Defendants' statement of material facts, Garthwaite admits that Jordan chose Ross and Marshall because they were "the main cooks."  (Doc. 18, ¶ 9).  Finally, Garthwaite accuses Jordan of discrimination by making her wait to get her "Servsafe Certification" but permitting other employees, all African-Americans, to get it.  (Doc. 17 at 92:16-24).  However, while employed, Garthwaite was not the only one without this certification; Alice Greene, an African-American, also did not.  (Doc. 24, ¶ 7).

**B. Garthwaite's Altercation with a Coworker and Subsequent Resignation**

On November 11, 2012, Garthwaite and Apollonia McCrorey were involved in an altercation over another coworker, Lottie Johnson, who did not come into work that day. (Doc. 17 at 98:22-103:18). Garthwaite complained that Johnson had left roasts out from the night before. (Doc. 17 at 101:6-13). According to Garthwaite, McCrorey said that Garthwaite could not perform two jobs, that she was going to get Johnson fired if she complained about the roasts, that Johnson would shoot her, and that Garthwaite's car would get keyed. (Doc. 17 at 100:20-102:24, 103:2-10). Garthwaite also states that other employees joined in McCrorey's "antagonizing" but admits that she cannot recall anything that any other employee said during this incident. (Doc. 17 at 103:19-106:9). By failing to respond to the statement of material facts, Garthwaite admits that she yelled "screw y'all," or something similar, and left. (Docs. 15, ¶ 147; 23, ¶ 8). With Jordan present, Joseph Nelson, the administrator of Lynn Haven, fired McCrorey as a result of this altercation. (Docs. 19, ¶ 15; 24, ¶ 11). Garthwaite submitted her resignation the day after the altercation and without prior notice because she "couldn't take it anymore." (Doc. 17 at 99:1-6, 103:1-2, 165).

**C. Lynn Haven's Equal Employment Opportunity Policy and "Zero-Tolerance" Policies Against Workplace Harassment and Violence**

To address complaints of harassment like Garthwaite's, Lynn Haven set forth in its Associate Guidelines its equal employment opportunity policy, zero-tolerance policies against harassment and violence, and a "Problem-Solving Procedure" should a workplace issue arise. (Doc. 17 at 187-94). Upon being hired, Garthwaite went through a new employee orientation and received a copy of the Associate Guidelines which contained all of these polices, and she received training specifically regarding the no-

harassment policy.  (Doc. 17 at 56:15-23, 110:10-111:19).  The no-harassment policy instructed Garthwaite, as well as all employees, to notify her supervisor immediately should she feel harassed.  (Doc. 17 at 191-92).  But if she felt uncomfortable to speak with the supervisor or if the supervisor is part of the problem, she was instructed to "report the incident or misconduct to the next level of management or the President."  (Doc. 17 at 191-92).  In addition to these polices, Lynn Haven adopted a "Problem-Solving Procedure" which informed employees of the steps to take to address workplace issues.  (Doc. 17 at 191).  Like the harassment policy, the "Problem-Solving Procedure" instructs an employee to go to her supervisor should she have a complaint, but if the supervisor cannot help or is part of the problem, to go to the administrator.  (Doc. 17 at 191).  If the employee is unsatisfied with the administrator's assistance, she may take the complaint to the administrator's supervisor, and if the employee is still unsatisfied, she may speak with human resources.  (Doc. 17 at 191).  In her deposition, Garthwaite acknowledges she signed a statement that she understood and agreed to the contents of the Associate Guidelines handbook and kept a copy of this handbook.  (Doc. 17 at 57:2-25, 58:1-3).

 Garthwaite testifies that she spoke with Jordan, her supervisor, at least ten times about her workplace issues.  (Doc. 17 at 95:2-17).  However, she only asked Jordan why her coworkers treated her "this way," why they could not get along, and why her coworkers did not like her.  (Doc. 17 at 94:10-15).  She admits she does not know if Jordan ever spoke to any other employee about Garthwaite's workplace concerns.  (Doc. 17 at 94:16-18).  Garthwaite does testify that she reported the sugar canister incident to Jordan but concedes that Jordan spoke with the employee involved.  (Doc.

17 at 94:19-22). However, Garthwaite did not utilize Lynn Haven's complaint-reporting procedures after her altercation with McCrorey on November 11, 2012. Rather, she decided to resign and refused to speak with Joseph Nelson, the Administrator, about the altercation or any other workplace issue. (Docs. 17 at 122:5-13; 24, ¶ 13). She also refused to speak with any other Lynn Haven personnel about the incident with McCrorey. (Doc. 17 at 118:12-119:8). Instead, Garthwaite filed an EEOC charge three days after delivering her resignation letter. (Doc. 17 at 168). Garthwaite testifies that throughout her time at Lynn Haven, she never brought a workplace complaint to Nelson's attention, his supervisor, the president of Lynn Haven, or human resources pursuant to Lynn Haven's reporting procedures. (Doc. 17 at 118:12-119:8).

## II.   DISCUSSION

### A. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

Where the non-movant files no response to the motion for summary judgment, the moving party must still meet its initial burden by reference to "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" to establish the absence of evidence to support the nonmoving party's claims. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). "The district court cannot base its decision on the mere fact that the motion is unopposed, but must consider the merits of the motion." *Allen v. Burnside*, No. 5:06-CV-151, 2007 WL 2904018, at *1 (M.D. Ga.) (citing *U.S. v. One Piece of Real Prop. Located at 5800 SW 74th Ave. Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004)). Further, the Court must view the evidence and all factual inferences in the light most favorable to the non-movant. *Anderson*, 477 U.S. at 255.

### B. Hostile Work Environment Claim

To establish a prima facie case for a hostile work environment claim, Garthwaite must show: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected class; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under either vicarious or direct liability. *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir. 2012). The plaintiff must meet both a subjective and objective test to show the harassing conduct was severe or pervasive. Thus, "[t]he burden is on the plaintiff to demonstrate that he perceived, and that a reasonable person would perceive, the working environment to be hostile or abusive." *Id.* at 1299 (citation omitted). When

evaluating whether the harassment is objectively severe or pervasive, the Court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). The relevant inquiry is "whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive to alter the terms or conditions of the plaintiff's employment." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251 (11th Cir. 2014).

The Defendants argue they are entitled to summary judgment because the majority of the alleged harassment was not based on race, and the remaining race-based actions were not sufficiently severe and pervasive to alter the terms and conditions of Garthwaite's employment. (Doc. 14 at 9-15). Moreover, even if the race-based harassment was severe and pervasive, Garthwaite cannot establish the Defendants' liability for the actions by her coworkers, and the *Faragher/Ellerth* defense shields them from liability for the actions by her supervisor. (Doc. 14 at 15-18).

### 1. Whether the alleged harassment was based on race

As a preliminary matter, the Court will address whether the alleged harassment was based on race. The Defendants contend the evidence does not support that all of the allegations of harassment were based on race, and thus, these "race-neutral" allegations should not be considered in the Court's analysis. (Doc. 14 at 9-12). The Eleventh Circuit has stated that "[o]nly conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Jones*, 683

F.3d at 1297. As discussed above, by virtue of failing to respond to the Defendants' statement of material facts, Garthwaite has admitted the following conduct was motivated by something other than race: (1) being called "dirty" because of her uniform and because of her co-workers' perception that she did not wash her hands, did not wear gloves, and left food out; (2) being criticized for her cooking because of her abilities and experience; and (3) being called at home by her supervisor to discuss work-related issues, as the supervisor did with other employees.[6] Garthwaite also admits that Alice Greene never blamed her for melting the seals on the blending machine.[7] Further, in her deposition, Garthwaite fails to provide testimony that the nicknames "Mary" or "Leanerbelle" were connected to her race. *See Fodor v. E. Shipbuilding Grp.*, ___F. App'x___, 2015 WL 424284, at *3 (11th Cir. 2015) (concluding the plaintiff failed to provide a "link" to connect the co-workers' pranks as motivated by the plaintiff's race). Accordingly, the Court does not consider these allegations of harassment in its analysis.

Still, it is Garthwaite's deposition testimony that McCrorey and Marshall told her on two separate occasions that the "aggravation" she was experiencing was because she is white. (Doc. 17 at 51:19-52:2, 73:7-9). For purposes of this motion, the Court considers the following allegations of harassment to be based on race: (1) coworkers' commenting that she cannot cook certain foods because she is white; (2) a coworker's commenting that the coworker could cook better than Garthwaite because the coworker is black; (3) being called a "burr head rat" by her supervisor; (4) being teased about a broken water line by coworkers; (5) having paper towels thrown at her by her

---

[6] *See supra* notes 2-3.
[7] *See supra* note 5.

supervisor; (6) being falsely accused for burn rings on a cart by her supervisor; (7) being hit with a sugar canister by a coworker; and (8) being threatened with physical assault and property damage by a coworker.

### 2. Whether the Defendants are liable for the conduct of Garthwaite's coworkers

Even assuming there is sufficient evidence to find that the alleged race-based harassment was sufficiently severe and pervasive to alter Garthwaite's workplace conditions, the Court agrees there is insufficient evidence to hold the Defendants liable for the coworkers' actions. "[T]he employer will be held liable [for the conduct of coworkers] only if it 'knew or should have known of the harassing conduct but failed to take prompt remedial action.'" *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007) (quoting *Miller*, 277 F.3d at 1278). Notice can be actual or constructive. "Actual notice is established by proof that management knew of the harassment." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003). Actual notice may be proven if the "complaining employee" utilizes the employer's harassment-reporting procedures. *Id.* "Constructive notice … is established when the harassment was so severe and pervasive that management reasonably should have known of it." *Id.* The burden is on Garthwaite to show the Defendants had notice and failed to take remedial action. *See Miller*, 277 F.3d at 1278.

In her deposition, Garthwaite testifies generally that she reported complaints to her supervisor Barbara Jordan about ten times. (Doc. 17 at 95:2-17). However, Garthwaite simply states that she asked Jordan why her coworkers treated her "this way," why she and her coworkers could not get along, and why her coworkers did not like her. (Doc. 17 at 94:10-18). Such general complaints are insufficient to put the

Defendants on notice of discriminatory harassment. *See Terrell v. Paulding Cnty.*, 539 F. App'x 929, 932-33 (11th Cir. 2013). In *Terrell*, the plaintiff attempted to establish actual notice by pointing to general complaints she made in meetings with her supervisors but failed to provide evidence that she gave these supervisors specific examples of her coworkers' harassment. *Id.* The Eleventh Circuit held that these complaints lacked specificity, and thus the plaintiff failed to meet her burden to establish notice. *Id.* at 933. Similarly, in her deposition, Garthwaite is unable to provide any specific details about her complaints to Jordan or the incidents from which the complaints stemmed. As a result, Garthwaite does not testify whether the complaints concerned race-based harassment or simply other insulting conduct. *See Fodor*, 2015 WL 424284, at *3 (recognizing the plaintiff failed to allege a link between the incidents reported and the alleged race-based harassment). The only specific example Garthwaite recounts telling Jordan is that an employee hit Garthwaite with a sugar canister. (Doc. 17 at 94:19-22). However, Garthwaite admits that Jordan addressed the complaint and spoke with the employee involved.[8] (Doc. 17 at 94:19-22). Accordingly, there is insufficient evidence for a reasonable jury to find that the Defendants had actual notice of discriminatory harassment by the coworkers, or that no remedial action was taken when notice was given.

Neither is there sufficient evidence for a reasonable jury to find that the Defendants had constructive notice. The Eleventh Circuit has held that where an employer has adopted and enforced comprehensive anti-discrimination and harassment policies which are disseminated to the employees and provide alternative avenues of

---

[8] The Defendants contend that the sugar canister incident was not motivated by race. (Doc. 14 at 11). However, for purposes of this motion, the Court assumes that the incident was motivated by race.

redress, the employer is "insulated" from liability for a hostile work environment claim "premised on constructive knowledge." *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997); *see also Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 583 (11th Cir. 2007) (analogizing *Farley* to the facts of the case and concluding the employer's anti-harassment policy shielded it from liability). In *Farley*, the plaintiff did not challenge the adequacy of the employer's harassment policy, and it was undisputed that the employer provided its harassment policy to its employees and communicated the policy in training classes. *Id.* at 1553. Further, the policy provided multiple avenues of redress should an employee have a complaint. *Id.* The Eleventh Circuit held that based on such facts, the employer was not on constructive notice of the plaintiff's harassment because it had taken diligent efforts to know "what is going on." *Id.* at 1554.

Here, the Defendants took similarly diligent efforts to know "what [was] going on" through Lynn Haven's "No-Harassment Policy." Like the plaintiff in *Farley*, Garthwaite received specific training regarding the harassment policy and does not challenge the "efficacy or adequacy" of the harassment policy. (Doc. 17 at 108:19-22). Rather, she concedes that in addition to the training, she was provided the harassment policy in the Associate Guidelines handbook at orientation, signed an understanding and agreement of the contents of the handbook, and kept a copy of the handbook. (Doc. 17 at 56:15-23, 57:2-25, 58:1-3). Further, the Defendants' policy, like the policy in *Farley*, provided multiple avenues of redress. For example, a Lynn Haven employee can bring a complaint to her supervisor, or if the supervisor is part of the problem, she can speak with the next level of management or the President.[9] (Doc. 17 at 191). The "Problem-

---

[9] This policy provides in part:

Solving Procedure" also advises that an employee can speak with the administrator, the administrator's supervisor if unsatisfied with the administrator, or human resources if the employee is still unsatisfied. (Doc. 17 at 191). In sum, there is insufficient evidence to challenge the effectiveness of the harassment policy so "as to confer constructive knowledge." *Farley*, 115 F.3d at 1554; *cf. Watson*, 324 F.3d at 1260 (distinguishing the case from *Farley* because the plaintiff presented evidence to challenge the effectiveness of the company's policy). Accordingly, the Defendants lacked constructive notice of the alleged harassment, given the diligent efforts taken to know "what [was] going on" at Lynn Haven.

Thus, because there is insufficient evidence for a reasonable jury to conclude that the Defendants were on actual or constructive notice of the alleged harassment or that no remedial action was taken when notice was given, the Defendants are shielded from liability for the actions of Garthwaite's coworkers.

### 2. Whether the Defendants are liable for the conduct of the supervisor

The Defendants argue the *Faragher/Ellerth* defense shields them from liability for the actions of Garthwaite's supervisor, Barbara Jordan. (Doc. 14 at 16). The Court agrees. To establish the *Faragher/Ellerth* defense, the Defendants must show they (1) "exercised reasonable care to prevent and promptly correct harassing behavior," and (2) Garthwaite must have "unreasonably failed to take advantage of any preventative or

---

> If you feel that you are being harassed in any way by a manager, supervisor, co-worker, or non-associate, or if you observe another associate being harassed, you should notify your supervisor immediately. The matter will be investigated and the appropriate action will be taken to stop any offensive behavior and misconduct .... If it is difficult or uncomfortable for you to discuss such a matter with your supervisor or manager (or if the harassment involves the supervisor or manager), you should report the incident or misconduct to the next level of management or to the President.

(Doc. 17 at 191).

corrective opportunities." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 802 (1998) (internal quotation marks omitted)).

Lynn Haven's "zero-tolerance" policy against workplace harassment and violence satisfies the first element. *See Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1286 (11th Cir. 2003) ("The Court in *Faragher* implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy."). Lynn Haven's policy allows a victim of harassment to report the offending conduct to the supervisor, but if the supervisor is part of the problem, the victim may report the conduct to the administrator. *See id.* ("At a minimum, employers must establish a complaint procedure designed to encourage victims of harassment to come forward without requiring a victim to complain first to the offending supervisor.").

Garthwaite's failure to report any alleged racial harassment by her supervisor to the administrator of Lynn Haven or any other appropriate personnel pursuant to its reporting procedures satisfies the second element of the defense because she "unreasonably failed to take advantage of" any corrective measures Lynn Haven had in place*. See Faragher*, 524 U.S. at 807-08 ("[P]roof that an employee failed to … use any complaint procedure provided by the employer … will normally suffice to satisfy the employer's burden under the second element of the defense."); *Fodor*, 2015 WL 424284, at *3. Instead of reporting her complaints, Garthwaite simply resigned without discussing her workplace problems with any administrative personnel. (Docs. 17 at 122:5-13; 24, ¶ 13). As discussed above, when the administrator of Lynn Haven tried to

contact Garthwaite after she quit, Garthwaite would not discuss her issues with him. (Doc. 24, ¶ 13). Moreover, Garthwaite testifies that throughout her time at Lynn Haven, she never spoke to the administrator, his supervisor, the president of Lynn Haven, or human resources about any workplace issue pursuant to Lynn Haven's reporting procedures. (Doc. 17 at 118:12-119:8). Therefore, because Garthwaite never gave Lynn Haven a chance to "address the situation and prevent further harm from occurring," and because Lynn Haven had a reasonable policy in place to address such workplace harassment, the *Faragher/Ellerth* defense shields the Defendants from liability.

### C. Constructive Discharge Claim[10]

Garthwaite also alleged in her complaint that the comments and actions by her fellow employees and supervisor forced her to resign. To establish constructive discharge, Garthwaite must prove that working conditions were "so intolerable that a reasonable person in [her] position would have been compelled to resign." *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999). The plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum requirement to prove a hostile working environment." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) ("The harassment here, while substantial, did not rise to the level of severity necessary for constructive discharge."), *aff'd*, 511 U.S. 244 (1994). "This objective standard sets a high threshold." *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 895 (11th Cir.

---

[10] The Court notes that the Defendants do not raise the *Faragher/Ellerth* defense as to the constructive discharge claim.

2013). The Eleventh Circuit has "required pervasive conduct by employers before finding that … a constructive discharge occurred." *Hipp*, 252 F.3d at 1231.

The evidence before the Court is insufficient for a rational jury to find Garthwaite's working environment was so intolerable that the conditions would compel a reasonable person in her position to resign. *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002) ("[A] constructive discharge claim does not present a jury issue unless a plaintiff produces substantial evidence that conditions were intolerable."). As discussed above, Garthwaite testifies that she was told she cannot cook certain foods because she is white, was told by an employee that she could cook better than Garthwaite because the employee is black, was called a "burr head rat" at least fifty times, was told to watch her back by a coworker, was teased about a broken water line, had paper towels thrown at her by her supervisor, was falsely accused for burn rings on a cart by her supervisor, was hit with a sugar canister by a coworker, and was threatened with physical assault and property damage by a coworker. Although this alleged conduct was uncivil and disrespectful, and on occasion race-related, it was not sufficiently severe and pervasive to support a constructive discharge claim. *Cf. Bryant v. Jones*, 575 F.3d 1281, 1289-90, 1298-99 (11th Cir. 2009) (holding that a constructive discharge claim had been established with evidence that the employer "was abusive … on numerous occasions"); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (holding there was sufficient evidence to support a constructive discharge claim where the plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers.").

The conduct was more akin to "simple teasing, offhand comments, and isolated incidents" which the Supreme Court has stated "will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 778. Garthwaite herself testifies that she was not sure what "burr head rat" meant—the only alleged racial slur. (Doc. 17 at 151:19-152:2). She further concedes that she never made complaints to administrative personnel because conditions "didn't get that bad until towards the end." (Doc. 17 at 121:12-17). And at the end, the Defendants took prompt, remedial action by immediately firing the employee who threatened Garthwaite. (Doc. 24, ¶11). *See Landgraf*, 968 F.2d at 430 (holding there was insufficient evidence to support a constructive discharge claim where the employer took reasonable actions to "alleviate the harassment" at the time the employee resigned).

Moreover, the working conditions, even at the end, were not so intolerable that Garthwaite could not have remained at her job "while seeking redress." *See Brantley v. City of Macon*, 390 F. Supp. 2d 1314, 1328 (M.D. Ga. 2005) (citing *Perry v. Harris Chemin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("But unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to stay on the job while seeking redress.")). Resignation cannot be said to be voluntary when working conditions are so intolerable that an employee must resign before seeking redress. *Id.* As discussed, however, the Defendants took affirmative, corrective steps when presented with a complaint. Garthwaite's supervisor addressed the sugar canister incident. (Doc. 17 at 94:19-22). Further, the Defendants' administrator immediately fired the employee who directed threats at Garthwaite on her last day and then reached out to Garthwaite to address her workplace issues. (Docs. 17 at 122:5-13; 24, ¶ 13). It

was Garthwaite who refused to discuss the matter. (Doc. 24, ¶ 13). Thus, even considering the evidence in the light most favorable to Garthwaite, the Court cannot conclude such conduct resulted in a workplace environment so intolerable that she could not have remained at her job while seeking redress and was instead forced to resign. Accordingly, summary judgment in favor of the Defendants is appropriate as to this claim.

### III.     CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED**.

**SO ORDERED**, this 24th day of April, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL
UNITED STATES DISTRICT COURT
